**Leonard P. BERNSTEIN, Acting Regional Director for Region 17 of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner,**

v.

**CARTER & SONS FREIGHTWAYS, INC., Respondent.**

No. CIV. A. 97–1344–FGT.

United States District Court, D. Kansas.

Oct. 23, 1997.

Constance N. Traylor, Naomi L. Stuart, N.L.R.B., Overland Park, KS, for Petitioner.

David M. Curtis, Patrick S. Richter, Lori M. Carr, Gandere & Wynne, Dallas, TX, for Respondent.

## MEMORANDUM AND ORDER

THEIS, District Judge.

This matter is before the court on the petitioner's petition for injunction under section 10(j) of the National Labor Relations Act, Doc. 1, and the respondent's motion to dismiss, Doc. 12. The court heard oral argument on September 22, 1997 and now issues its ruling.

**Motion to dismiss**

■ The respondent (hereinafter also referred to as Carter & Sons) asserts that the court lacks personal jurisdiction over it because it has not been properly served with process. This action was filed on August 14, 1997, seeking injunctive relief under section 10(j) of the National Labor Relations Act (the Act), 29 U.S.C. § 160(j). Carter & Sons acknowledges that copies of the complaint and other pleadings have been delivered to it by hand delivery and certified mail, return receipt requested. Carter & Sons argues that this action should be dismissed since no summons has been served upon it as required by Fed.R.Civ.P. 4.

■ This proceeding is ancillary to an unfair labor practice proceeding presently pending before the National Labor Relations Board (hereinafter also referred to as the NLRB or the Board). Section 10(j) of the Act provides:

The Board shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in ques-

tion is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

29 U.S.C. § 160(j). This statutory provision "merely requires that adequate notice of the petition be served upon the respondent; strict adherence to Rule 4 summons specifications is not a requirement for jurisdiction over the party." *Gottfried v. Frankel,* 818 F.2d 485, 492–93 (6th Cir.1987). Rule 4 requires sufficient notice be given to the party of the claims brought against it. Dismissal is not in order unless the party has been prejudiced. *Id.* at 493.

In the present case, Carter & Sons was served with the petition, giving it notice of the petitioner's allegations against it and the remedy sought. Carter & Sons was aware of the nature of the allegations, since, at the time of the filing of the petition, the parties were involved in unfair labor practice proceedings before the Board. Carter & Sons has suffered no prejudice by the petitioner's noncompliance with the requirements of Rule 4. Accordingly, the motion to dismiss shall be denied.

**Petition for injunction**

On August 27–28, 1997, the parties participated in an evidentiary hearing before an administrative law judge of the NLRB. The petitioner has filed the administrative record with the court. Doc. 10. The parties agreed that an evidentiary hearing was not necessary in the present case and instead rely on the transcript of the administrative hearing.

*Allegations of the petition*

The petition alleges that on June 23, 1997, Teamsters Union Local 795 filed a charge alleging that respondent, Carter & Sons Freightways, Inc., violated sections 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) and (3). After investigation, a complaint was issued. It is alleged that Carter & Sons management performed the following acts from June 16 to 20, 1997: interrogated employees about their union activities; threatened to close the facility and discharge employees if employees continued to support the union; ordered employees to retrieve the union authorization cards they had signed; and threatened employees with reprisals because the employees continued in their support of the union. On or about June 23, 1997, Carter & Sons subcontracted to other companies the work previously performed by employees Bill Casselman, Steve Hoelscher, Ed Newman and Glen Tucker. Carter & Sons terminated these four employees on June 23, 1997. These four employees were a majority of the unit appropriate for collective bargaining. The four terminated employees had all signed union authorization cards. The NLRB alleges that Carter & Sons took this action because the employees assisted the union and engaged in concerted activities, and to discourage employees from engaging in these activities.

The Board seeks a bargaining order, which would require Carter & Sons, as of June 19, 1997, to recognize and bargain with the union as the exclusive collective bargaining representative of its employees in the relevant unit. Pending the outcome of the unfair labor practice proceedings before the Board, the petitioner seeks an injunction which would: enjoin Carter & Sons from terminating its employees because of their support of the union, subcontracting its work out, threatening to close its facility and discharge its employees for supporting the union, threatening employees with reprisals, interrogating employees about union activities, or in any manner interfering with, restraining or coercing employees in the exercise of their rights under the Fair Labor Standards Act.

The injunction would further order defendant to take the following affirmative action: restore and reinstitute operations at the Wichita facility to their status as of June 19; offer interim reinstatement to Bill Casselman, Steve Hoelscher, Ed Newman and Glen Tucker, at their previous wages and working conditions, recognize and bargain in good faith with the Teamsters Local 795, post copies of the order at its facility, and within 20 days file a sworn affidavit outlining its

compliance with the order. Petition for Injunction under Section 10(j) of the National Labor Relations Act, as amended, Doc. 1 (filed August 14, 1997).

*Testimony from the administrative hearing*

Carter & Sons is a Texas corporation with its principal place of business in Carrolton, Texas. Carter & Sons is engaged in the interstate transportation of freight. The parties stipulated at the hearing that Ron Carter is Carter & Son's President and CEO, Fred Churchill is vice president and chief operating officer, and Mike Dyer is a vice president. It was further stipulated that these individuals are agents and supervisors within the meaning of the National Labor Relations Act. Later in the hearing it was stipulated that Jerry Milam, Carter & Son's district manager and terminal manager at the Wichita facility, was a supervisor within the meaning of the Act. Effective August 1, 1996, respondent's name was changed from Eagle Freightways, Inc., to Carter & Sons Freightways, Inc. Finally, the parties stipulated that on June 18, 1997, at 11:27 a.m., the representation petition filed by the union, and a letter explaining the general procedures of the National Labor Relations Board relevant to representation petition, were successfully sent via facsimile to respondent's Wichita facility.

The general counsel of the NLRB presented testimony of several current or former customers of Carter & Sons. Andrea Stras, vice president and secretary of Kamen Wiping Materials Company, testified that her company had had a business relationship with Carter & Sons since about September 1995, and shipped approximately 20 to 35 separate monthly shipments via Carter & Sons. Doc. 10, Transcript of administrative hearing (hereinafter Tr.), at 17–18. During the week of June 23, 1997, terminal manager Jerry Milam visited Stras at her office. Milam told Stras that Carter & Sons had fired all their drivers because they wanted to have union representation. According to Milam, company founder Ron Carter would not allow the union to come into Carter & Sons. Tr. 21–22. Milam outlined how business would continue as usual with the new company doing the pickups and deliveries instead of Carter & Sons employees. Stras testified that she did not like how the employees all got fired, and terminated her business relationship with Carter & Sons. Tr. 24.

Mike Dixon of the Coleman Company testified that his company has had a business relationship with Carter & Sons since March 1996. Tr. 33–34. Dixon testified regarding a phone conversation he had with Jerry Milam on or about June 18 or 19. Dixon called Milam to inquire as to how much capacity Carter & Sons could provide Coleman during the last week in June, one of Coleman's peak shipping times. Tr. 39. Milam indicated that he was going to call Dixon to arrange a temporary discontinuation of pickup service for the last week of June and first week of July. Tr. 40 Milam indicated they were having some turmoil due to an organization petition. Tr. 40. On June 25, Dixon met with Carter & Sons vice president Churchill and Milam. They assured Dixon that, for all intents and purposes, Carter & Sons would remain the same. After July 8 the person doing the pickups would be from Professional Cargo Service (PCS) but that person should be considered merely an agent for Carter & Sons. Tr. 43.

Colin O'Neal, of Pro Drivers, Incorporated, testified. His business is to provide permanent or temporary placement for Class A and Class B drivers. Tr. 46. On approximately Wednesday, June 18, Jerry Milam called and asked if Pro Drivers could supply Carter & Sons with four drivers for the following Monday, June 23. Tr. 49. O'Neal, who knew that Carter & Sons employed four drivers, asked Milam, what are you going to do, fire everybody? Milam said he could not comment. Tr. 50. Subsequently, Milam arranged for O'Neal to send two drivers to PCS on Monday morning. Tr. 50. The drivers sent to PCS were billed to Carter & Sons. Tr. 51. The only explanation for needing the drivers was that Carter & Sons was closing its facility. Tr. 52. The PCS tractors would use Carter & Sons trailers. Tr. 55.

Debbie Helten of Universal Products testified that her company began using Carter & Sons for shipping when Carter & Sons began its operations in Wichita. Tr. 62. Helten

testified that beginning in late June, the pickup driver (who used to be Carter & Sons employee Ed Newman) changed. A Professional Cargo Service (PCS) employee began doing their freight pickups. Tr. 63–64. Jerry Milam called to tell her their Wichita terminal had closed, but that everything would run the same as it always had, with PCS doing the pickups and deliveries. Tr. 65. Milam stated that there was a third party involved. Tr. 66. In July, after Helton was questioned by the National Labor Relations Board about this case, Universal Products stopped using Carter & Sons. Tr. 68.

Teamsters Local 795 business agent Charles Peaster testified regarding the brief organizational campaign. Peaster got a phone call on approximately June 9 or 10 from Carter & Sons employee Edward Newman. They set up a meeting for June 12 to discuss organizing the employees of Carter & Sons. Three employees, Newman, William Casselman and Steve Hoelscher, came to the meeting. All three signed union cards that evening. The next day, Friday the 13th, they brought a signed card from the fourth local delivery driver, Glen Tucker. Peaster sent the signed cards on to the NLRB Regional office in Overland Park, Kansas and faxed in a petition for recognition to the NLRB regarding Carter & Sons. On June 20, the original three employees came back to Peaster, saying the company had threatened them. Tr. 77. Peaster filed the unfair labor practice charge after the three reported on Monday the 23rd that they had all been terminated.

The four terminated employees testified. Ed Newman testified about Jerry Milam's alleged threats. On Monday, June 16, Newman had a discussion with Jerry Milam about the union activity. Tr. 103. Milam asked Newman what they had done with the union. Newman responded that the employees felt they deserved better and were seeking representation. Milam stated that Ron Carter would never be represented by a third party and that the employees were making a big mistake. If union representation was pursued, there was the possibility that the plant would be closed. Tr. 104.

Newman also testified about a meeting held on Thursday, June 19 with Churchill and Dyer. Newman testified that Churchill threatened that the terminal would be shut down for economic reasons if the men did not pull their union cards. Churchill discussed an organization campaign at their Kansas City terminal. Carter himself had gone to Kansas City to talk to the employees. Carter told the Kansas City employees that he would padlock the terminal if they went union. Tr. 108–09. The subject of employee evaluations came up at the meeting, and Newman and Hoelscher were told that their pay raises were being postponed, and that they would be evaluated in 30 to 60 days to see if raises were warranted. Tr. 109–10. After the other employees left the meeting, Newman testified that Churchill threatened him. Tr. 111.

Glen Tucker also testified about the meeting during which Churchill discussed the organizational campaign in Kansas City and how the Wichita terminal would be closed because Ron Carter would not be represented by a third party. Tr. 152–53. Tucker decided he did not want to support the union any more and told Newman to retrieve his card. Tr. 154.

Steve Hoelscher also testified that Churchill made threats at the meeting on June 19. Hoelscher testified that Churchill said there would be no third party union involved, that if the employees did not get their union cards back, the plant would be shut down. Tr. 184. Hoelscher testified that he and Newman had been denied raises based upon their reviews. They were told that they would receive their raises in 90 days. Tr. 185. Hoelscher testified that Churchill talked about the aborted organizational campaign in Kansas City. Ron Carter had said he would shut down the Kansas City terminal if it went union, and Churchill said the same thing would happen if Wichita went union. Tr. 186. After they were fired, Churchill told them that they had made a big mistake, they should have pulled their union cards. Tr. 191.

William Casselman gave a similar account of the meeting at which Churchill discussed the Kansas City terminal and threatened the Wichita terminal with closure if the employ-

ees did not pull their union cards. Tr. 211–12.

On Friday, June 20, Milam asked Newman what the employees had decided. Newman talked to the other employees, to make sure they wanted to continue with the union campaign. Glen Tucker wanted his union card retrieved, but Newman and the other employees wanted to pursue union representation. Tr. 112–13. Later in the day, Milam asked what they had decided. Newman told Milam that they decided to stick with the union. Milam responded that they had made a very big mistake. Tr. 115–16. Hoelscher was present in the office at this time, and testified that Milam told Newman that he had made an ass of himself. Tr. 190.

Newman testified regarding reporting to work Monday morning, June 23, and being terminated. Tr. 117–18. Newman, Hoelscher and Casselman arrived together. Churchill was present and told the employees that the terminal had been shut down. Tr. 190–91. Newman testified that Churchill looked over at him and said he hoped it was worth it. Tr. 118. Hoelscher testified that Churchill told them they had made a big mistake; they should have pulled their cards. Tr. 191.

The employees testified that revenues were increasing at the Wichita terminal. Hoelscher testified that Jerry Milam was proud that revenue was growing at the Wichita terminal. Business had picked up. Tr. 176–77. Casselman testified that Jerry Milam seemed pleased about the increase in business and increase in revenue at the terminal. Tr. 205–06. Newman testified the equipment did not sit idle at the facility, that he himself was picking up more freight than when he started working for Carter & Sons. Milam posted their daily revenues on an erasable board and commented that revenues were increasing. Tr. 95–97.

Duane Zogleman is the owner of Professional Cargo Services (PCS). Tr. 226. PCS is in the business of freight deliveries, primarily to western Kansas. Tr. 227. Prior to June 20, 1997, PCS had a business relationship with Carter & Sons that involved the interlining of freight. PCS would pick up freight at the Carter & Sons terminal in Wichita for delivery to areas outside of Carter & Sons' territory. Tr. 229. PCS used its own tractors and trailers for this business. Tr. 229–30.

During the week of June 16, Zogleman had a phone conversation with Carter & Sons vice president Fred Churchill. Churchill called Zogleman to ask if PCS would be able to take on some additional business. Tr. 230–31. At the end of that week, Zogleman spoke again with representatives of Carter & Sons. Tr. 231. On Friday, June 20, Zogleman met with Churchill at Zogleman's office. Churchill stated that Carter & Sons was going to close down its Wichita facility and wanted to know if PCS was interested in taking care of the local cartage. Tr. 233. On June 20, PCS and Carter & Sons entered into an interline cartage agreement covering the Wichita metropolitan area and surrounding towns. Tr. 233–35. The agreement covered work that was previously employed by Carter & Sons' employees. Tr. 236. Churchill had informed Zogleman that Carter & Sons was going to close down the terminal and dismiss its employees. Carter & Sons employee Debra Devlin informed Zogleman that the terminal was having labor problems. Tr. 236. In performing its work for Carter & Sons, PCS uses its own tractors but may use Carter & Sons trailers. Tr. 237.

Presently located in the PCS facility are the Carter & Sons telephone line, facsimile machine, computer terminal and office equipment. A PCS employee performs the Carter & Sons clerical work. Tr. 239–41. Jerry Milam stops by the PCS facility each morning. Tr. 242. Carter & Sons remaining driver, road driver Darryl Gulledge, operates out of the PCS facility. Gulledge is paid by Carter & Sons. Tr. 242–43. PCS employees perform all of the unloading and loading of freight. Tr. 243.

Zogleman testified that his company has similar arrangements with five other carriers and that such arrangements are common in the industry. Tr. 248–49. On several prior occasions, other carriers would have computer terminals and facsimile machines set up in the PCS facility. Tr. 250. Zogleman did not increase the number of employees as a result

of the agreement with Carter & Sons, although the number of freight bills handled did increase. Tr. 253.

Fred Churchill, vice president and chief operating officer for Carter & Sons testified that Carter & Sons was founded in March 1995. Tr. 257. Carter & Sons consists of what Churchill called 22 terminal agencies— 12 company terminals and 10 company agencies. The Wichita operation is considered an agency terminal. Tr. 258. Churchill executed the contract that gave the local pickup and delivery work to PCS, work that was previously performed by Carter & Sons employees. Tr. 258–59, 281. The contract is terminable at will with thirty days notice. General Counsel Exhibit 19.

The lease for the Morris Street premises, which was the Carter & Sons terminal until the close of business June 20, 1997, was extended in early 1997 for a period of two years, or until June 30, 1999. Tr. 261–62. The lease allows Carter & Sons to sublease the premises. Tr. 267. As of the date of the administrative hearing, the premises had not been subleased. Tr. 304.[1]

Some of the office equipment from Carter & Sons was moved over to the PCS facility for Jerry Milam's use. Tr. 273–74.

Churchill testified that the Wichita terminal was the smallest terminal, and also the terminal with the most personnel conflicts. Tr. 283.

Churchill had a meeting with Ron Carter on a Monday June 16. Tr. 306. Churchill testified that Carter had reviewed the employee evaluations of two of the Wichita drivers. Carter told Churchill that he was ready to close the Wichita terminal. Tr. 285. Churchill testified that on that same day he contacted Duane Zogleman of PCS to find out if that company would be available to perform Carter & Sons pickup and delivery work. Churchill set up a meeting with Zogleman for Thursday, June 19. Churchill also contacted Milam about setting up a meeting with the drivers for that same day. Tr. 286.

Churchill and Dyer met with Zogleman on June 19 for several hours and reached a tentative agreement. Tr. 288. Churchill testified that his instructions from Ron Carter were to close the Wichita terminal. Tr. 289.

Churchill and Dyer met with the four Wichita city drivers in the evening of June 19. Tr. 291. During this meeting, Ed Newman inquired about "the Kansas City situation." Tr. 292. Churchill related that Ron Carter had met with his Kansas City employees and informed them that he preferred to have a union-free truck line. Tr. 294. Churchill testified that the remainder of the meeting consisted of questions from the employees regarding the employee handbook, profit sharing, sick leave and safety issues. Tr. 295.

Churchill testified that neither he nor Dyer told the employees during the June 19 meeting that Ron Carter had already decided to close the terminal. Tr. 296. In response to the question, "Did you threaten them [the employees] in any way?", Churchill stated, "I thought it was the most amicable meeting I'd ever sat in on." Tr. 297.

On Friday, June 20, Churchill and Dyer left Wichita to drive back to Texas. They stopped near Oklahoma City to call Ron Carter. Carter told them to return to Wichita that day and work out the arrangement with Zogleman. They returned to Wichita and reached an agreement with Zogleman that evening. Tr. 299. On Saturday, Churchill and Dyer returned to Texas. Churchill loaded up his car with equipment from the office, Dyer drove a tractor back to Texas, and another employee flew to Wichita to drive another tractor back to Texas. Tr. 300.

Churchill returned to Wichita Sunday afternoon. Churchill and Milam went to the terminal Monday morning at about 6:00. Tr. 301. When the employees arrived at around 8:00 a.m., Churchill informed them that Ron Carter had closed the terminal due to business reasons. Tr. 302. Churchill testified that Newman and Hoelscher came to visit him the next day to ask for their jobs back. Tr. 303.

Churchill testified that Carter's reasons for considering closing the Wichita terminal

---

1. As of the date of oral argument, the facility had not been subleased.

were the two employee evaluations. Churchill testified additionally that Wichita was the worst terminal in terms of revenue generation, and the equipment in Wichita could be used elsewhere. Tr. 306. Regarding the two employee evaluations, Ed Newman was rated "average" overall. Tr. 310. Steve Hoelscher was rated "average" overall. Tr. 311. These two evaluations were signed by Dyer on May 30, 1997 and by Carter & Sons Vice President Al Lawyer on June 16, 1997. According to the notation on the evaluations, both employees were to be continued on probationary status for ninety days and were not scheduled to be terminated. Tr. 313.

Churchill testified that he conducted the four hour meeting with the Carter & Sons drivers on Thursday, June 19, merely as a professional courtesy, since Ron Carter had already ordered him to close the plant. Tr. 318. Churchill admitted that he knew of the involvement of a labor union at the time he conducted the June 19 meeting. Tr. 318. In an affidavit prepared in connection with the investigation of the charge, Churchill stated that at the time he and Dyer went to the terminal on Thursday, June 19, "Since no decision had been made regarding the future employment of these drivers, we did not discuss the closure of Carter's Wichita interminal operations." Tr. 319–20.

Churchill testified at the hearing that he had specific instructions from Ron Carter on June 19 to close the terminal. Tr. 320. Churchill testified that the decision had already been made to close the terminal. The former Carter & Sons employees could apply to work for PCS. Tr. 322.

Churchill admitted that he told the Wichita employees during the June 19 meeting that Ron Carter preferred a union-free truck line. Tr. 324. Churchill testified that at the meeting on June 19, he told the employees that they would receive new copies of the employee handbook just as soon as they were printed. Tr. 328–29.

Michael P. Dyer is a Vice President of Carter & Sons. Tr. 333–34. Dyer conducted an evaluation of the Wichita terminal on February 26, 1997 and found it to be in very satisfactory condition. Tr. 336–37.

Dyer testified that Debra Devlin and Jerry Milam, the two office employees of the Wichita terminal, did not get along. Tr. 337–340. Devlin complained frequently to Carter & Sons about matters in the Wichita terminal. Tr. 353. Devlin and Milam received a warning letter regarding an earlier (January 21, 1997) unsatisfactory evaluation of the terminal. Tr. 340–41.

Prior to the unsatisfactory January 21, 1997 evaluation, Dyer stated there were other problems with the Wichita terminal. Tr. 342. Dyer stated that on one occasion, Ron Carter came to the terminal and found equipment (tractors and trailers) which was not being used and could be used at other terminal locations. Tr. 342–43. On two additional occasions, other equipment was moved from the Wichita terminal, where it was sitting idle due to poor sales, to other terminals that were using leased equipment. Tr. 346.

Sales became a problem for the Wichita terminal. Tr. 343–45. Carter & Sons terminated their Wichita salesperson and gave Jerry Milam the entire responsibility for sales in Wichita. Tr. 349.

The last evaluation Dyer performed of the Wichita terminal was in February 1997, and the terminal was rated very satisfactory. Dyer testified that no more idle equipment was left sitting around the Wichita terminal. Tr. 355.

Dyer continued to receive complaints from Devlin and Milam about various matters. Tr. 356. Dyer was also aware of some substandard employee evaluations of some of the Wichita drivers. Tr. 356. Employee turnover was higher at the Wichita terminal than at any other terminal. Tr. 346.

Certified public accountant Mike L. O'Brien was retained by Carter & Sons to determine the financial impact of the conversion of the Wichita terminal to an agency terminal. Tr. 358–60. For the year ending May 31, 1997, O'Brien calculated that the Wichita terminal incurred a loss of approximately $9,500. Tr. 366. O'Brien testified that it is financially beneficial for Carter & Sons to operate the terminal through an agent arrangement rather than as a company owned facility, with an increase in operating

income of approximately $8,900 per month. Tr. 367. O'Brien estimated that operating expenses would decrease by close to $30,000 per month under an agent operated terminal. Tr. 370. O'Brien gave his opinion that the conversion from a company owned facility to an agent operated facility was a prudent financial decision. Tr. 373.

O'Brien performed this work in the two weeks prior to the hearing before the administrative law judge and had not performed any services for Carter & Sons prior to that time. Tr. 373. O'Brien's report, Company Exhibit 11, did not exist at the time Carter & Sons made its decision. Tr. 374. The administrative law judge admitted the exhibit for purposes of the remedy stage of the proceedings, not the liability phase. Tr. 375–76.

Company documents indicated that the Wichita terminal had a profit of $10,532 for the month of January 1997. Tr. 385–86. In the month of February 1997, the Wichita terminal had a profit of $1,013. Tr. 386. That same month, the Kansas City terminal showed a loss of over $40,000. Tr. 386. The Wichita terminal showed a profit for the months of March, April and May 1997. General Counsel Exhibit 34, pp. 3–5.

Payment of rent on the leased facilities, although an ongoing expense, was not included within operating costs on O'Brien's report. Tr. 391. Neither were utility costs. Tr. 391.

Ron Carter is President and Chief Executive Officer of Carter & Sons. Tr. 393. Carter testified that on Saturday, June 14, 1997 he was looking at employee evaluations. Carter disagreed with the recommendation of the Wichita district manager that two employees be given wage increases. Tr. 393–94. Carter testified that this was not the first time there had been problems with the Wichita terminal. Tr. 394. Carter testified that in December 1995 he found trailers at the Wichita facility that had not been used for four months, while trailers were needed in Oklahoma City and Kansas City. Tr. 395. At some time in 1996, when the company was leasing equipment elsewhere, three tractors were sitting in Wichita not being used. Tr. 395.

Ron Carter testified that the Wichita terminal had an extremely high rate of turnover of drivers. None of the four local drivers employed at the terminal in June 1997 had been with company more than a few months. None of the other terminals experienced that kind of turnover. Tr. 396.

Ron Carter testified that Carter & Sons was still losing money. Tr. 397. The account manager in Wichita had to be terminated because the terminal was not getting enough revenue. Terminal manager Jerry Milam had to perform the sales work. Tr. 397–98. Carter testified that of the terminals opened in 1995, the Wichita terminal was producing the lowest revenue. Tr. 398–99.

Carter testified that the two employee evaluations that he reviewed on June 14 were the last straw. Carter found it unacceptable for the two employees to be recommended for wage increases. Carter felt that the company needed to spend its resources in larger markets. Jerry Milam and Debra Devlin were constantly bickering and taking the time of personnel in Dallas. Tr. 399–400. Carter subsequently discovered that none of the drivers in Wichita had been employed with Carter & Sons over six months. Tr. 400.

Carter testified that in the beginning, he opened company-operated terminals, but since then, he opened a number of agent terminals. Tr. 399. The equipment at the Wichita terminal was needed elsewhere. Tr. 401.

When reviewing employee Ed Newman's evaluation on Saturday, June 14, Carter placed the following note on the evaluation form, "Why would we give an increase to [a] driver rated 2 [below average] in quality, quantity, knowledge, dependability." At the bottom of the form, Carter noted, "Extend 90 day probation till improved." General Counsel Exhibit 14. Carter also ordered that Steve Hoelscher's probationary period be extended 90 days. Tr. 402, General Counsel Exhibit 32. Carter then discovered that his other two Wichita drivers had been employed less than three weeks each. Tr. 402.

Carter testified that on Monday, June 16, he met with Churchill and Dyer and told them that the Wichita terminal needed to be closed. Tr. 404. Churchill and Dyer wanted to have a meeting with the employees to find out what was going on in Wichita. Tr. 405. Carter testified that Churchill and Dyer disobeyed his instructions by heading back to Dallas without reaching an agreement with an agent. Tr. 405–06, 417.

Carter was aware of the union representation petition on the same day that it was filed, Wednesday, June 18. Tr. 413–14. Carter discussed it with his attorneys that same day. Tr. 414.

The Wichita terminal was the only terminal originally operated as a company-operated terminal that has been closed. Tr. 419.

Having summarized the evidence from the administrative hearing, the court now makes its findings of fact and conclusions of law. For the reasons set forth herein, the petition for injunction shall be granted.

*Findings of Fact*

Petitioner is Acting Regional Director for Region 17 of the NLRB, an agency of the United States, and files this petition for and on behalf of the Board.

Jurisdiction of the court is invoked pursuant to section 10(j) of the National Labor Relations Act, 29 U.S.C. § 160(j).

On June 23, 1997, the International Brotherhood of Teamsters, Local Union No. 795 ("the union") filed a charge in Case 17–CA–19247 alleging that the respondent violated section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1). On July 18, 1997, the union filed an amended charge in the same case alleging that respondent violated sections 8(a)(1) and (3) of the Act, 29 U.S.C. § 158(a)(1) and (3). On July 24, 1997, the union filed a second amended charge alleging that respondent violated sections 8(a)(1) and (3) of the Act.

The charges were referred to F. Rozier Sharp as Regional Director for Region 17 of the Board for investigation.

Upon the basis of the investigation of the charges, the petitioner has reasonable cause to believe that the charges are true. The General Counsel of the Board, on behalf of the Board, by the Regional Director, issued a Complaint and Notice of Hearing in Case 7–CA–19247, on July 24, 1997, based on the charges. On July 25, 1997, the General Counsel issued an Amendment to Complaint, pursuant to section 10(b) of the Act, 29 U.S.C. § 160(b), alleging that respondent has engaged in, and is engaging in, unfair labor practices as charged within the meaning of sections 8(a)(1) and (3) of the Act.

There is reasonable cause to believe that:

(a) At all material times respondent, a corporation with an office and place of business in Wichita, Kansas (also referred to as "the facility"), has been engaged in the interstate transportation of goods and freight.

(b) Respondent, in conducting its business operations described above, annually derives gross revenues exceeding $50,000 for the transportation of freight from the State of Texas directly to points outside the State of Texas.

(c) During the 12 month period ending June 30, 1997, respondent, in conducting its business operations described above, derived gross revenues exceeding $50,000 for the transportation of freight from the State of Kansas directly to points outside the State of Kansas.

(d) Respondent, in conducting its business operation described above, annually performs services valued in excess of $50,000 in states other than the State of Kansas.

(e) At all material times respondent has been an employer engaged in commerce within the meaning of section 2(2), (6) and (7) of the Act, 29 U.S.C. § 152(2), (6) and (7).

(f) At all material times the union has been a labor organization within the meaning of section 2(5) of the Act, 29 U.S.C. § 152(5).

(g) At all material times the following named individuals held the positions listed and have been supervisors of respondent within the meaning of section 2(11) of the Act and agents of

respondent within the meaning of section 2(13) of the Act, 29 U.S.C. § 152(11), (13):

Ron Carter—President

Fred Churchill—Vice President/Chief Operating Officer

Mike Dyer—Vice President

Jerry Milam—Terminal Manager

Debra Devlin—Manager and Dispatcher

(h) On or about the dates in 1997 set forth below, respondent, acting through its agents and supervisors named below, at respondent's facility, engaged in the following acts and conduct:

(1) interrogated employees about their union activities or support, and the union activities of other employees:

Jerry Milam—June 16 and June 20

(2) threatened to close respondent's facility and discharge employees if employees continued to support the union, or if employees selected the union as their collective-bargaining representative:

Fred Churchill—June 19

Jerry Milam—June 16 and June 20

(3) ordered employees to retrieve union authorization cards they had signed on behalf of the union:

Fred Churchill—June 19

(4) threatened employees with unspecified reprisals because employees were continuing their activities and support on behalf of the union:

Jerry Milam—June 20.

(i) About June 23, 1997, respondent subcontracted the work previously performed by its employees Bill Casselman, Steve Hoelscher, Ed Newman and Glen Tucker to other companies, including Price Truck Lines, Inc. and Professional Cargo Services, Inc.

(j) About June 23, 1997, respondent discharged its employees Bill Casselman, Steve Hoelscher, Ed Newman and Glen Tucker, a majority of the unit appropriate for purposes of collective bargaining described below.

(k) Respondent engaged in the conduct described above because the employees of respondent named or referred to above assisted the union and engaged in concerted activities, and to discourage employees from engaging in these activities.

(l) The following employees of respondent, herein called the unit, constitute a unit appropriate for the purposes of collective bargaining within the meaning of section 9(b) of the Act, 29 U.S.C. § 159(b):

All full-time and regular part-time city pickup and delivery drivers and road drivers employed by respondent at its facility located in Wichita, Kansas, but excluding office clerical employees, dispatchers, professional employees, guards, and supervisors as defined in the Act.

(m) About June 12, 1997, a majority of the unit designated and selected the union as their representative for the purposes of collective bargaining with respondent.

(n) At all times since June 12, 1997, based on section 9(a) of the Act, 29 U.S.C. § 159(a), the union has been the exclusive collective bargaining representative of the unit.

(o) The conduct described above is so serious and substantial in character that the possibility of erasing the effects of these unfair labor practices and of conducting a fair election by the use of traditional remedies is slight, and the employees' sentiments regarding representation, having been expressed through authorization cards, would be protected better by issuance of a bargaining order than by traditional remedies alone. The bargaining order requires respondent, as of June 19, 1997, to recognize and bargain with the union as the exclusive collective bargaining representative of the unit described above.

(p) The acts and conduct set forth above have a close, intimate and substantial relation to trade, traffic and commerce among the several states and tend to

lead to, and do lead to, the burdening and obstructing of commerce and the free flow of commerce.

*Conclusions of Law*

 Section 10(j) of the National Labor Relations Act, 29 U.S.C. § 160(j), authorizes the district court to grant interim injunctive relief to maintain the status quo pending the Board's resolution of the merits of the underlying unfair labor practice charge. In this proceeding, the district court does not decide the merits of the unfair labor practice charge, since that is the Board's responsibility. *Sharp v. La Siesta Foods, Inc.,* 859 F.Supp. 1370, 1372–73 (D.Kan.1994). To resolve a section 10(j) petition, the district court considers only two issues: whether there is reasonable cause to believe that the respondent has violated the Act, and whether temporary injunctive relief is just and proper. *Id.* at 1373; *Angle v. Sacks,* 382 F.2d 655, 658–60 (10th Cir.1967).

 "Reasonable cause" to believe that unfair labor practices have occurred is a factual finding. To establish reasonable cause, the Regional Director has a relatively insubstantial burden. He need not prove that an unfair labor practice has occurred. He must only produce some evidence in support of the petition. Further, the Regional Director need not convince the court of the validity of the Board's theory of liability, as long as the theory is substantial and not frivolous. *See Gottfried v. Frankel,* 818 F.2d 485, 493 (6th Cir.1987). The court need only find that the petitioner's position is fairly supported by the evidence. To the extent the parties present conflicting factual allegations, the court must resolve the conflict in the light most favorable to the petitioner. *La Siesta Foods,* 859 F.Supp. at 1373.

 The respondent argues first that the reasonable cause standard has not been met on the facts before the court. The court disagrees.

Sections 8(a)(1) and (3) of the Act make it an unfair labor practice for any employer to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed by section 7; or to discriminate in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization. 29 U.S.C. § 158(a)(1) and (3).

There is sufficient evidence to support a finding of reasonable cause with respect to violations of section 8(1)(1) and (3) of the Act. The petitioner presented evidence that officials of Carter & Sons threatened to close the terminal and terminate the employees because of their union activity. The petitioner's evidence further showed that, when the employees refused to cease their unionization campaign, the respondent did close the terminal and terminate their employment. The petitioner presented evidence that respondent's agent Milam admitted to customers that Carter & Sons had fired its employees because the employees were unionizing. This evidence is in conflict with Carter & Son's evidence that it closed the terminal based solely on economic reasons. However, viewing the evidence in the light most favorable to the petitioner, as the court must, the evidence is sufficient to sustain the reasonable cause element of section 10(j). The court finds reasonable cause to believe that the respondent has engaged in unfair labor practices as charged in the administrative complaint.

 If the court finds that there is reasonable cause to believe that unfair labor practices have been committed, the court must next determine whether injunctive relief is "just and proper." The granting of injunctive relief under this standard is a matter committed to judicial discretion. *Gottfried,* 818 F.2d at 493–94. In making this determination, the court bears in mind that section 10(j) was added to give the Board a means of preserving the status quo pending the completion of administrative procedures. The relief to be granted is only that reasonably necessary to preserve the ultimate remedial power of the Board and is not to be a substitute for the exercise of that power. *Id.* at 494.

The Tenth Circuit has not adopted the traditional equitable standards for injunctive relief in section 10(j) proceedings. Rather, the standard in the Tenth Circuit is that:

relief under section 10(j) is just and proper upon a showing that the "purposes of the Act will be frustrated" or that the "efficacy of the Board's final order may be nullified, or the administrative procedures will be rendered meaningless" unless temporary relief is granted.

*La Siesta Foods,* 859 F.Supp. at 1374 (discussing *Angle v. Sacks,* 382 F.2d 655 (10th Cir.1967)). As noted in *Angle v. Sacks,* one of the concerns Congress addressed in passing section 10(j) was that the purposes of the National Labor Relations Act could be defeated in a particular case by the passage of time.· 382 F.2d at 659.

The court finds the requested injunctive relief to be just and proper. While the court had this petition under advisement, the administrative law judge of the NLRB has issued his ruling, finding that the respondent has committed the unfair labor practices charged and recommending substantially similar relief to that sought by the petitioner here. During the remainder of the administrative proceedings and any appeals to the court of appeals, this court finds it to be entirely just and proper to issue the injunctive relief requested by the petitioner. Further delay will do nothing to further the purposes of the National Labor Relations Act. The court finds the remedies sought to be appropriate, given the nature of the alleged violations. The court finds the petitioner's delay in seeking injunctive relief to be minimal. Finally, the court finds no undue burden on the respondent to comply with the injunction.

In its briefs to this court, the respondent argued that it had valid business and economic reasons for closing the Wichita facility. The respondent further argued that it presented undisputed evidence demonstrating that it considered closure prior to the onset of union activities. The respondent is, in reality, attempting to argue the merits of the unfair labor practice charge. The court cannot resolve the merits of the charge; that is a matter for the NLRB and those proceedings have not yet been concluded. The petitioner has met his relatively insubstantial burden of introducing evidence. The court does not determine witness credibility or re-solve factual disputes. The court need only determine that the evidence presented is substantial. The petitioner has met that burden.

**IT IS BY THIS COURT THEREFORE ORDERED** that respondent's motion to dismiss (Doc. 12) is hereby denied.

**IT IS FURTHER ORDERED** that petitioner's petition for injunction (Doc. 1) is hereby granted.·

**IT IS FURTHER ORDERED** that, pending the final disposition of the matters involved pending before the National Labor Relations Board, respondent Carter & Sons Freightways, Inc., its · officers, representatives, agents, servants, employees, attorneys, successors and assigns, and all persons acting in concert or participation with it or with them, shall be and they are hereby enjoined and restrained from:

(a) Terminating its employees because of their support for and activities· on behalf of the International Brotherhood of Teamsters, Local Union No. 795, AFL–CIO (the Union);

(b) Subcontracting its work to other companies in order to avoid unionization or bargaining with the Union;

(c) Threatening to close its facility and to discharge employees if employees continue to support the union, or if employees select the Union as their collective bargaining representative;

(d) Ordering employees to retrieve union authorization cards they have signed on behalf of the Union;

(e) Threatening employees with unspecified reprisals because employees continued their support for and activities on behalf of the Union;

(f) Interrogating employees about their union activities and support and the union activities and support of other employees;

(g) In any other manner interfering with, restraining or coercing employees in the exercise of the rights guaranteed in Section 7 of the Act.

**IT IS FURTHER ORDERED** that, pending the final disposition of the matters pend-

ing before the National Labor Relations Board, respondent Carter & Sons Freightways, Inc., its officers, representatives, agents, servants, employees, attorneys, successors and assigns, and all persons acting in concert or participation with it or with them, shall take the following affirmative action:

(a) Restore and reinstitute the operations at the Wichita, Kansas facility to their status as of June 19, 1997;

(b) Offer interim reinstatement at the Wichita, Kansas facility to employees Bill Casselman, Steve Hoelscher, Ed Newman and Glen Tucker at their previous wage rates and working conditions;

(c) Recognize and, upon request, bargain in good faith with the International Brotherhood of Teamsters, Local Union No. 795, AFL–CIO, as the exclusive collective bargaining representative of the unit described below at respondent's Wichita, Kansas facility, concerning their wages, hours, and other terms and conditions of employment. This bargaining obligation is effective retroactive to June 19, 1997. The unit is:

All full-time and regular part-time city pickup and delivery drivers and road drivers employed by respondent at its facility located in Wichita, Kansas, but excluding office clerical employees, dispatchers, professional employees, guards, and supervisors as defined in the Act.

(d) Post copies of this Memorandum and Order at respondent's Wichita, Kansas facility where notices to employees are customarily posted; said postings to be maintained during the pendency of the Board's administrative proceedings free from all obstructions and defacements; and grant to agents of the National Labor Relations Board reasonable access to respondent's Wichita, Kansas facility to monitor compliance with this posting requirement.

(e) File within twenty days of the issuance of this Memorandum and Order, with a copy submitted to the Regional Director of Region 17 of the National Labor Relations Board, a sworn affidavit from a responsible official of Carter & Sons Freightways, Inc., setting forth with specificity the manner in which respondent has complied with the terms of this order.